100

**FIDELITY TRUST CO. v. COLONIAL
TRUST CO. OF PITTSBURGH, PA.**

No. 9708.

United States Court of Appeals
Third Circuit.

Argued Nov. 19, 1948.

Reargued March 21, 1949.

Decided May 6, 1949.

O'CONNELL, Circuit Judge, dissenting.

C. Roscoe Hoffman, Pittsburgh, Pa.
(Richard W. Ahlers, Pittsburgh, Pa., on
the brief), for appellant.

Mahlon E. Lewis, Pittsburgh, Pa., for appellee.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, O'CONNELL, and KALODNER, Circuit Judges.

GOODRICH, Circuit Judge.

This appeal involves a dispute between a bank (Colonial Trust Company, appellant) which is acting for all the shareholders of a defunct national bank, and another bank (Fidelity Trust Company) which is trustee under the will of a shareholder of the defunct bank who died prior to the happening of the events here related. The issues concern the proper distribution among the shareholders of funds available after the creditors and depositors had been fully paid. The individual shareholder's trustee won in the court below.

A 100% assessment was made upon all the shareholders of the defunct bank when it became insolvent in 1931. One of these shareholders was the estate of John A. Harper. Mr. Harper had held 693 shares of the bank's stock (par value $50) and the assessment was $34,650. This, with interest up to the critical date about to be described, brought the total claim to $35,654.85. On May 16, 1932, the trustee tendered to the Receiver of the defunct bank all the assets in the Harper estate in settlement of the claim. These assets, consisting entirely of listed corporate shares and an interest in certain mortgages, are said to have been worth, at the time, $32,759.12. We do not know that the Receiver agreed that they were worth that much, but that seems to be the value put upon them in the inventory by the trustee at the time. It is, however, the market value as of May 14, 1932, which the parties to this case have stipulated. The Orphans' Court of Allegheny County stated as to the settlement: "The balance of the fund in the hands of the trustee * * * will be distributed to the Receiver * * * in full satisfaction of his claim * * *." After deducting administration expenses, the Receiver took assets valued, in the way described above, at $30,159.98 as against the $35,654.85 then due. The stock of the closed bank was awarded to the trustee of the Harper estate at the nominal sum of $1.

The National Bank Act authorizes a receiver to compromise the individual liability of a shareholder, with the approval of the Comptroller of the Currency and a court of competent jurisdiction.[1] The approval of the arrangement in this case by the Comptroller of the Currency came January 7, 1935 and approval by the District Court February 13, 1935. In the meantime, the value of the securities which came to the Receiver from the Harper estate had greatly increased. At the time of the final confirmation by the Court on February 13, 1935, they were worth $42,783.35. Things had gone well in the settlement of the affairs of the bank also. As receivership progressed its creditors were paid, the remaining assets were turned over by the Receiver to the appellant bank as agent for the shareholders, and beginning in 1943 distributions were made to the shareholders.[2] By March 3, 1945, three distributions had been made totalling $12.24 per share. The appellant, however, refused to pay to the Harper trustee any part of this distribution

[1] "Any receiver of a national banking association is authorized, with the approval of the Comptroller of the Currency and upon the order of a court of record of competent jurisdiction, to compromise, either before or after judgment, the individual liability of any shareholder of such association." 12 U.S.C.A. § 67.

[2] The National Bank Act provides that the proceeds of assets of a defunct bank which are undistributed after all obligations have been met, shall be distributed:
"First. To pay the expenses of the execution of the trust to the date of such payment.
"Second. To repay any amount or amounts which have been paid in by any shareholder or shareholders of such association upon and by reason of any and all assessments made upon the stock of such association by the order of the Comptroller of the Currency in accordance with the provisions of the statutes of the United States; and
"Third. The balance ratably among such stockholders, in proportion to the number of shares held and owned by each. Such distribution shall be made from time to time as the proceeds shall be received and as shall be deemed advisable by the said comptroller or said agent." 12 U.S.C.A. § 197.

until the dividends which that trustee otherwise would have received were sufficient to make up the difference between the amount of the original assessment against the Harper estate and the value of what the Harper estate paid the Receiver as of May 16, 1932. Appellant also added to the amount due from the Harper estate interest on the unpaid portion from November 21, 1931, the date of the assessment, until it was paid by the dividends credited to the Harper account.

The appellant's argument in justification of its refusal to pay the trustee of the Harper estate in the same way it has paid dividends to the other shareholders of the defunct bank rests on the doctrine of consideration at common law. The appellant says that the payment of 1932 was not a compromise but a payment on account and did not discharge the Harper estate's liability to the Receiver. It says that such payment could not be a discharge because there was no consideration for accord and satisfaction. The reason there was no consideration, the argument runs, is because the trustee gave property of determined value to the Receiver. If the property had been of undetermined value, like the hawk or the robe or the beaver hat talked about in the old books, it is admitted by the appellant that the payment of a chattel could have constituted discharge of the debt. But not so, it is said, when the parties have determined the value of the property which is turned over to the creditor.

■ The argument is interesting, but does not settle the question here. There is no need to dispute the well known common law rule that there is no consideration for payment of a liquidated claim by a lesser sum. Restatement, Contracts § 76 (1932). Assuming the appellant is right when he says that property transferred at a value fixed by the parties cannot discharge a debt for a greater sum than the value fixed, we do not find that the parties made

any valuation here. An Orphans' Court inventory indicates no agreement by a creditor that the property was worth what the inventory showed. We do not think that the common law rule of consideration contended for by the appellant fits the facts of this case as we see them.

■ More important, however, is that the appellant's argument ignores the wording of the statute which has to do with the authority of receivers of defunct national banks. The statute [3] gives the receiver of the bank authority to compromise the shareholder's liability either before or after judgment. We do not think that the term "compromise" as used by Congress is to be put in the straitjacket of common law rules respecting consideration. What Congress was after here, it seems to us, was to give authority to the receiver to close up claims against shareholders of failed banks. The safeguard for compromises made by receivers is found in the necessary approval by Comptroller and court. To limit the authority thus given by the artificial common law concepts of consideration would seem to us an unfortunate departure from the purpose of the statute. The turning over of Mr. Harper's estate to the Receiver was, just as it purported to be, a full settlement of the Receiver's claim against the Harper estate on the assessment.

When did this compromise of the Harper liability become effective? That is not so easy a question. The statute, as we have said above, authorizes the receiver to compromise, with the approval of the Comptroller of the Currency and a court of competent jurisdiction. There can be no doubt that the statutory approval is essential to completion of the compromise settlement. A strong argument can be made that the approval, when given, validates the settlement as of the time the receiver and shareholder made it.[4]

---

[3] 12 U.S.C.A. § 67, set out in full in footnote 1 supra.

[4] It has been suggested that the power to compromise claims may inhere in the office of the receiver, and that the purpose of § 67 as now written is "to make clear and certain the authority of bank receivers to compromise." Wagner, for

Use of Molner v. South Chicago Savings Bank, 7 Cir., 1944, 146 F.2d 686, 690, 159 A.L.R. 1105; 9 Zollmann, Banks and Banking, Perm.Ed., 1936, § 6265. There are many instances in the law of the retroactive effect of subsequent conduct. Two examples are ratification by a principal of a purported agent's acts, Re-

We think, however, on full consideration, that the compromise is to be given effect as of the date of District Court approval. This result is, first, harmonious with the wording of the statute already quoted. It recognizes also the status of the Comptroller of the Currency as the federal official primarily responsible for the conduct of the receivership.[5] The Comptroller's regulations specifically indicate that official's understanding that final statutory approval must precede an effective compromise.[6] An analogy may be drawn to the case of a receiver in bankruptcy whose proposed sale of property of the bankrupt estate does not become effective until court approval is obtained.[7] The appellant concedes that the compromise settlement has but the effect of an offer until the statutory approval is given. Cf. Griggs v. Baumer, 3 Cir., 1942, 130 F.2d 899. The effective acts for acceptance are the approval of Comptroller and court. This supports a conclusion that the time the bargain becomes effective is the time when such approval is given.

Moreover, in this case, the Receiver took over all of the Harper assets and held them for more than 2½ years before requesting approval of the settlement. If the securities had declined in value and the Comptroller had disapproved the settlement, there is no doubt that the Harper estate would have continued liable to the Receiver for the deficiency in the payment of its assessment.[8] It seems to us the equitable result that the increase in value which occurred during that time should accrue to the benefit of the shareholder.

We think, therefore, that the settlement was not legally complete until February 13, 1935 when the District Court order was made. At that time there was no discrepancy between the Harper estate's debt and its payment. There was, therefore, no reason to postpone payment of dividends to the estate's trustee, and it was entitled to share pro rata with other shareholders whose assessments had been paid in full.

### Interest.

Argument has been made by both sides as to what interest is owed and from when. If we are right in what we have said so far, the only dispute about interest concerns the period between May 16, 1932, the date when all the assets of the Harper estate were turned over to the Receiver, and February 13, 1935, the date when the settlement became final. Interest up to May 16, 1932, was included in the settlement and was taken care of by its approval. We think no other interest should be charged to the Harper estate. When the trustee of that estate turned over all its assets to the Receiver on May 16, 1932, it had done everything it could to pay the assessment. From that day the Receiver had full control of the securities and was entitled to collect the income on them. The question of interest arises now only because the Receiver delayed so long a time in obtaining approval of the settlement. Under

statement, Agency § 100 (1933), and the retroactive effect of the delayed appointment of an administrator or executor, Kleiner v. Kleiner, 1946, 139 N.J.Eq. 26, 49 A.2d 582.

[5] In re Chetwood, 1897, 165 U.S. 443, 17 S.Ct. 385, 41 L.Ed. 782; Cooper v. O'Connor, 1939, 70 App.D.C. 238, 105 F.2d 761.

[6] Instructions to National Bank Receivers, c. VI, sec. 5, p. 44 (Office of Comptroller of the Currency, 1932): "Only bad or doubtful debts may be compromised, and even in those instances the approval of the Comptroller and the authority of an order of a court of record of competent jurisdiction are first necessary.

"When a debtor proposes to compromise his obligation to the bank the receiver should obtain the fullest information possible regarding his financial standing and ability to pay. If he is certain the debt cannot be collected in full the compromise proposition should be submitted to the Comptroller, with a full and complete statement of the debtor's resources and the receiver's recommendation as to whether the compromise should or should not be made. If the proposition is approved by the Comptroller and authorized by a court of competent jurisdiction, the compromise may be effected."

[7] 6 Remington, Bankruptcy § 2531 et seq. (4th ed. 1937).

[8] Anyone dealing with a receiver has notice from the statute that the compromise is subject to approval. General Discount Corp. v. Schram, D.C.E.D.Mich. 1942, 47 F.Supp. 845.

these circumstances we think there is no equitable basis for a claim of interest.

The judgment of the District Court will be affirmed.

O'CONNELL, Circuit Judge (dissenting).

I too believe that the agreement made by the receiver of the National Bank and the Harper estate was a compromise agreement of the type contemplated and authorized by the Act of February 25, 1930, 12 U.S.C.A. § 67. Unquestionably, under the provisions of that Act, the approval of the Comptroller and the authorization of the court were necessary; and, once those endorsements were given, the liability of the Harper estate was discharged. I am of the opinion, however, that such compromise agreement, having been sanctioned by the district court in 1935, cannot in a collateral proceeding initiated in 1945 be modified in effect so as to substitute new values for those approved ten years before.

Summarized, my position is that an essential feature of the compromise agreement which was approved by the district court in 1935 was the valuation of the assets of the Harper estate as proposed by the Harper estate and decreed by the State probate court as of 1932.

Because of the importance of the questions here involved in the administration of the national banking laws, I shall discuss them at some length.

What did the district court consider and pass upon when it entered its order of February 13, 1935, approving the compromise agreement?

The answer to this question in the first instance is to be found in the 1935 decree of the district court. It authorized the receiver "to accept from the Fidelity Trust Company of Pittsburgh [appellee here] the following assets of the Estate of John A. Harper * * * in accordance with a decree of Orphans' Court in and for Allegheny County, Pennsylvania, at No. 205, January Term, 1932." The receiver, then, was not to accept the assets *qua* assets but *in accordance with a specific decree* of a state court of competent jurisdiction.

When I turn to the Orphans' Court proceeding, I find a colloquy, reprinted in the footnote below,[1] disclosing that the representative of the Harper estate and the receiver both acted with complete understanding that the assessment due the receiver was greater than the value of the assets which the Harper estate tendered in compromise; further, that the Harper estate recognized and intended that the then market value of the securities should be an integral part of the compromise agreement it proposed to the receiver and which the probate court in the first instance had to approve, because it offered in evidence an exhibit appending a list of the assets with their then market value. It is not inapposite to note that, had the Harper estate and the receiver not intended such values to be binding upon all interested parties, the trustee of the estate could and should have liquidated the assets so as to have a fund to apply on account of the debt due the receiver; and so, to relieve itself of any charge of neglect in duty in this respect, the trustee notified the children and life tenants of Harper that if the proposed compromise was not satisfactory to them, they should appear at the audit and bid more than the receiver.[2] Moreover, the Orphans' Court decree ordered that "the funds in the hands of the accountant,

---

1 "Mr. Stoner [counsel for estate]: The assets of the estate are several thousand dollars less than an amount sufficient to pay the Receiver of the Bank of Pittsburgh, N. A., but I understand Mr. Frazer, representing the Receiver, is prepared to put upon the record the fact that he will accept the securities composing this trust, other than the Bank of Pittsburgh stock, in full of the liability of the trust to the Bank of Pittsburgh, Receiver, Mr. C. O. Thomas.

"Mr. Frazer [counsel for receiver]: That is right. The amount of the claim

is $34,650 and interest to date amounts to $1004.85, a total of $35,654.85. The Receiver will accept the securities in the estate in satisfaction of his claim."

2 "The market value of the securities shown to be on hand, listed on pages 2 and 3 of the account, is less than the claim of the Receiver for the Bank of Pittsburgh, N. A. Fidelity Trust Company notified Alberta Harper Irish, Florence Harper Byram and Lydia E. H. Brush, children of John A. Harper and the life tenants under his will, *that the Receiv*

to-wit, $32,759.12, be paid in accordance with the schedule of distribution hereto attached"; which schedule of distribution, an elaborate document reproduced in the footnote below,[3] likewise gave a stated value for each item in the assets of the estate.

As though this were not sufficient, the Harper estate advised the Comptroller in writing several weeks later, in 1932, that the assets as listed *and evaluated* in the decree were "in full settlement of the stock assessment liability of the [Harper] Estate * * *, $34,650."

In view of these facts, was the compromise agreement one in which the Harper estate merely undertook to furnish a list of assets which the receiver could acquire? or was it one in which the value of those assets received consideration and became a prime object of the negotiations? I think reality dictates the latter. I cannot believe that a compromise was effected with an understanding that the value of the assets was to be subsequently determined by their market value on whatever date the district court approving the compromise happened to take statutory action.[4]

---

*N. A. would appear at the audit of this account on May 16, 1932 and would bid up to $34,650.00, with interest, for the securities shown to be in the hands of the Trustees,* exclusive of The Bank of Pittsburgh stock, and that if they cared to bid more than that amount they should so inform the accountants or appear at the audit and make an offer therefor. *A list of the securities, together with the present market value,* is attached hereto and marked Exhibit 'A'." (Emphasis supplied). Supplemental Audit Statement.

---

**3** "Schedule of Distribution

    * * *

"To C. O. Thomas, Rec. of Bk. of Pitts. N. A. Balance in full of assessment of $50 a share on 693 shrs. Bank of Pitts. N. A.

| | | | |
|---|---|---|---:|
| 13 shrs. | General Cable Corp. Class 'A' at 1-1/2 | | 19.50 |
| 43 " | General Cable Corp. Class 'A' Warrants | | 0.00 |
| 144 " | General Cable Corp. Common at 3/4 | | 108.00 |
| 43 " | General Cable Corp. Preferred at 6-1/8 | | 263.38 |
| 20 " | Pittsburgh Coal Co. Preferred at 20 | | 400.00 |
| $6500 Bonds | Gen. Cable Corp. 5-1/2s 47 'A' at 43-3/4 | | 2,843.75 |
| $ 600 " | Chic. Milwaukee St. P. & Pac. 5s 75 at 20 | | 120.00 |
| $2400 " | Chic. Milwaukee St. P. & Pac. 5s 2000 at 4 | | 96.00 |
| $3000 " | Pgh. & Alle. Teleph. 1st M. 5s 49 at 100-1/2 | | 3,015.00 |
| $2000 " | Pgh. Terminal Warehouse & Trans. Co. 5% 1st Ref. Mtg. 36 at 10 | | 200.00 |
| $3000 " | Southern Ry. Co. 6-1/2% Deb. & G. M. 56 | | 900.00 |
| $2000 " | West Penn Power Co. 5% 1st Mtg. Ser. E 63 | | 2,025.00 |
| Interest in the following Participation Mortgages: | | | |
| Installment Mtge. Fund 6% | | | 16,150.00 |
| A. Shapiro " 6% | | | 4,000.00 |
| Cash | | | 18.95 |
| | | | 30,159.58" |

---

**4** I point out in passing that, by virtue of the provisions of 12 U.S.C. § 197, 12 U.S.C.A. § 197, the parties before us are, in effect, the same as those which engaged in the extensive negotiations culminating in the 1935 court order. It was the Harper estate which tendered the assets at stated value in compromise. The Harper estate advised the Orphans' Court with a detailed list, that the assets were smaller than the assessment. The Harper estate was aware that the beneficiaries, to keep the assets, had to bid a sum greater than the assessment. The Harper estate advised the Comptroller that the assets as valued were "in full settlement." The Harper estate made no move to block the approval of the Comptroller or authorization of the district court. The liquidation of the closed bank was conducted throughout upon the theory that the Harper estate had discharged its liability by an 85% payment in settlement. Why should a court now intervene and permit the Harper estate even to assert a value contrary to that which it has itself assigned over a period of years? Cf. the principles of collateral estoppel and law of the case.

I can find nothing in the record to indicate that *any* of the participants intended or expected the 1935 approval to change one iota of the agreement previously negotiated between the receiver and the Harper estate. In this connection, a review of the cases reveals that, in approving or rejecting sales or compromise agreements proposed by a receiver of a national banking association, the court is "a superior and advisory administrative officer," whose "approval is merely an administrative condition precedent to the congressionally granted executive power to sell." Mitchell v. Joseph, 7 Cir., 1941, 117 F.2d 253, 255. See also Hulse v. Argetsinger, 2 Cir., 1927, 18 F.2d 944, 945; Griggs v. Baumer, 3 Cir., 1942, 130 F.2d 899, 901; and Oosterhuis v. Palmer, 2 Cir., 1943, 137 F.2d 322, 325, 153 A.L.R. 475.

If it is to be held nevertheless that the terms of a compromise with a stockholder of a national bank are to be modified *as a matter of law* so that the market value of securities offered in discharge of a stockholder's obligation in such instances is to be affixed as of the date of the decree of the district court approving such compromise, I find some difficulty in resolving the following questions:

(a) Are the rights of stockholders, those who pay their assessments in full in cash promptly as well as those who settle their liability to the receiver by the innumerable varieties of compromise settlements, to depend upon the fortuitous circumstances of the condition of the security market as of the date of a decree by the district court approving such compromise settlements? Why the date of the decree? By adopting such a date, we have the incongruous result that neither the stockholder nor the Comptroller of Currency has the slightest idea of the values they are said to have agreed upon until the court actually signs the decree, probably days or weeks later; and the court likewise, unless it consults the ticker-tape, is at sea at the time of entering the decree. If something other than the value agreed upon by the stockholder and the receiver and submitted to and approved by the district court is to be subsequently substituted, it seems to me more logical to await the actual sale of such securities by the receiver, for then and only until then, can it be determined what funds the receiver has actually realized upon the assessment.

(b) Why, under the holding of the majority of this court, was the approval of the Comptroller or authorization of the court necessary in this case? If we are to disregard the values agreed upon by the Harper estate and the receiver of the National Bank, and to substitute therefor the market value as of the date either of submission of such matter to the district court for approval or the date of the decree of the district court, it would appear in the matter sub judice that the district court was without jurisdicion: for, the market value of the securities then being in excess of the debt due the receiver, *there was no compromise* for the court either to approve or disapprove in its discretion.

The majority of this court appears to place some reliance upon the argument that if the assets of the Harper estate had declined in value, and if the Comptroller had disapproved of the compromise, the Harper estate would still have been liable for the deficiency in its assessment. Of course. Disapproval by either the Comptroller or the district court would have restored the Harper estate to the position it would have had if no agreement had been made, regardless of whether its assets depreciated, appreciated, or remained constant in value. I find it difficult to believe that any district court would, or could, in the exercise of its discretion, refuse to approve a compromise agreement made in good faith between a receiver of a national bank and a stockholder under which such debtor turned over to the receiver securities having a readily ascertainable market value, even where the receiver or the Comptroller delayed an unreasonable length of time between the receipt of such securities and the seeking of approval of the compromise agreement by the district court and, in the interim, the market value of the securities declined. If the receiver's estate has suffered under such circumstances, it may well be that some question of surcharge might be lodged against the receiver, but surely the district court would not penalize the innocent stockholder for

the dereliction in duty of the receiver or Comptroller.

Accordingly, I believe the judgment of the lower court should be reversed.